**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA ELAINE McGRATH, | ) Case No. CV 17-1977-JPR |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
| ———————————————— | ) |

**I.  PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed November 24, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1964. (Administrative Record ("AR") 86.) She completed three years of college (AR 278) and last worked as a clerk for an airline (AR 278, 292).

On October 11, 2012, Plaintiff filed applications for DIB and SSI, alleging that she had been disabled since July 13, 2012, because of chronic back pain, headaches, depression, and arthritis. (AR 86-87, 98-99, 245-53.) After her applications were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (See AR 140, 146, 152.) Her first hearing was held on January 23, 2014; she was represented by counsel and testified, as did a vocational expert. (AR 40-54.) In a written decision issued February 24, 2014, the ALJ found Plaintiff not disabled. (AR 119-28.) The Appeals Council vacated the decision and remanded for further proceedings.[1] (AR 134-36.) A second hearing was held before a new ALJ on June 8, 2016, at which Plaintiff, who was again represented by counsel, testified, as did a vocational expert. (AR 55-85.) On August 4, 2016, that ALJ issued a written decision finding her not disabled. (AR 20-37.)

Plaintiff requested review and submitted additional medical evidence to the council. (AR 15, 545-46.) On February 15, 2017,

---

[1] The council directed the ALJ to evaluate the opinion of a state-agency consultant; redetermine Plaintiff's RFC using specific functional limitations; resolve any inconsistency between the RFC, which "[did] not include social limitations," and the consulting psychiatric examiner's finding of "moderate difficulties in social functioning"; and reassess whether Plaintiff could perform her past relevant work if she indeed had such difficulties. (AR 134-35.)

it denied review, finding that the additional evidence did not provide a basis for changing the ALJ's decision, and ordered that the new evidence be made part of the administrative record. (AR 1-6.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is

expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth

4

step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 13, 2012, the alleged disability-onset date. (AR 23.) At step two, he concluded that Plaintiff had the following severe impairments: "degenerative disease of the lumbar spine; history of degenerative shoulder disease; depression and anxiety." (<u>Id.</u>) At step three, he found that she did not have an impairment or combination of impairments

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

falling under a Listing.  (AR 25-26.)

At step four, the ALJ found that Plaintiff had the RFC to perform modified sedentary work:

> [She] should not perform work above the shoulders; [she] is limited [to] unskilled to semiskilled work (maximum SVP 4); [she] is limited to occasional interaction with coworkers, supervisors and the general public; [she] should be allowed the use of a cane when ambulating.

(AR 28.)

Based on the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as a data-entry clerk.  (AR 32.)  Thus, he found her not disabled.  (Id.)

**V.  DISCUSSION**

Plaintiff argues that the ALJ failed to properly evaluate the opinion of psychiatrist Nina Kapitanski (J. Stip. at 3-7), properly determine her RFC and present a "complete" hypothetical to the VE (id. at 10-12), and "fully and fairly" develop the record (id. at 14-15).  For the reasons discussed below, however, the ALJ did not err and remand is unwarranted.

> A.  The ALJ Properly Evaluated Dr. Kapitanski's Opinion and Determined the RFC and VE Hypothetical

Plaintiff argues that the ALJ "failed to provide specific and legitimate reasons, supported by substantial evidence, for implicitly rejecting [Dr. Kapitanski's] opinion," specifically the "moderate limitations" she assessed as to Plaintiff's "completing a normal workday or workweek" and "be[ing] able to handle the usual stresses, changes, and demands of gainful employment."  (Id. at 5 (citing AR 375).)  She contends that

6

because the ALJ allegedly failed to consider or mention those moderate-limitation assessments, the RFC was "incomplete and unsupported by substantial evidence." (Id. at 12.)  The ALJ also erred, she continues, because moderate limitations were allegedly not included in the hypothetical posed to the VE.  (Id.)

### 1.  Applicable law

A claimant's RFC is "the most [she] can still do" despite impairments and related symptoms that "may cause physical and mental limitations" affecting "what [she] can do in a work setting."  §§ 404.1545(a)(1), 416.945(a)(1).  A district court must affirm an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical opinions "together with the rest of the relevant evidence." §§ 404.1527(b), 416.927(b);[3] see also §§ 404.1545(a)(1), 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

_____

[3] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017.  When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision.  See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking").  Accordingly, citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the versions in effect from August 24, 2012, to March 26, 2017.

7

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating-source opinion is generally entitled to more weight than an examining one, and an examining-source opinion is generally entitled to more weight than a nonexamining one. <u>Id.</u>; <u>see</u> §§ 404.1527(c)(1), 416.927(c)(1). This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989); <u>see</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008). When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. <u>Magallanes</u>, 881 F.2d at 751; <u>see</u> <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate

explanation, among other things.  §§ 404.1527(c)(3)-(6),
416.927(c)(3)-(6).  Those factors also determine the weight
afforded the opinions of nonexamining physicians.
§§ 404.1527(e), 416.927(e).  The ALJ considers findings by state-
agency medical consultants and experts as opinion evidence.
§§ 404.1527(e), 416.927(e).

In determining an RFC, the ALJ should consider those
limitations for which there is support in the record and need not
take into account properly rejected evidence or subjective
complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC
determination because "the ALJ took into account those
limitations for which there was record support that did not
depend on [claimant]'s subjective complaints"); Batson v. Comm'r
of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not
required to incorporate into RFC those findings from physician
opinions that were "permissibly discounted").

Furthermore, "[t]he ALJ need not accept the opinion of any
physician . . . if that opinion is brief, conclusory, and
inadequately supported by clinical findings."  Thomas v.
Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson, 359
F.3d at 1195.  An ALJ need not recite "magic words" to reject a
physician's opinion or a portion of it; the court may draw
"specific and legitimate inferences" from the ALJ's opinion.
Magallanes, 881 F.2d at 755.

The Court must consider the ALJ's decision in the context of
"the entire record as a whole," and if the "'evidence is
susceptible to more than one rational interpretation,' the ALJ's
decision should be upheld."  Ryan v. Comm'r of Soc. Sec., 528

F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

    2.  <u>Relevant background</u>

      a.  *Mental-health records*

Before the relevant period, in 2009 and 2010, Plaintiff received some mental-health treatment. (<u>See, e.g.</u>, AR 378-85.) At an initial consultation in October 2009, she reported a "depressed mood" and needing help "manag[ing] the transition" after a recent move to Los Angeles. (AR 383.) During the interview, she was "talkative," made "normal eye contact," and "cried once." (<u>Id.</u>) Her mood was "appropriate," and she was "oriented x4." (<u>Id.</u>) She was assessed with an "Adjustment Disorder With Depressed Mood Chronic." (AR 385.)

In a "psycho-social report" completed in March 2010, after eight weeks of treatment, Plaintiff was noted as having "good interpersonal skills" and being "friendly, outgoing, cooperative and polite." (AR 379.) She was "intelligent"; "proactive about self-care for physical health, including daily exercise, stretches for her back, and a healthy diet"; "caring toward others"; and "rebuilding a network of friends" and "support," which included "her sister and grandfather, with whom she ha[d] recently reconnected." (AR 380.) She was assessed with "Pain Disorder Associated With Both Psychological Factors and a General Medical Condition, Chronic" and a Global Assessment of Functioning score of 63, among other things.[4] (AR 382.) In

---

    [4] A GAF score of 61 to 70 indicates some mild symptoms or difficulty in social, occupational, or school functioning but generally functioning pretty well, with some meaningful interpersonal relationships. See <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (revised 4th ed. 2000). The

August or December 2010, Plaintiff "decided to discontinue therapy." (See AR 503 (Aug. 2010), 378 (Dec. 2010).)

During 2011 and 2012, before the relevant period, Plaintiff was seen for low-back pain and was also occasionally noted as being "alert," "oriented," and "non[]tangential" and having "good insight" and "good eye contact." (AR 435 (Feb. 2011), 419 (Aug. 2011), 403 (Mar. 2012).) At one point, however, she reported difficulty in her relationships and was referred to psychotherapy. (AR 422-23 (Aug. 2011).) No evidence of any such psychotherapy is contained in the record.

Indeed, Plaintiff apparently did not receive any mental-health treatment during the relevant period. (See AR 71-72 (ALJ noting that Plaintiff had received no treatment for depression "in this period").) At most, the record reflects that she may

Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012). Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are "medical opinion evidence under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017) (citing Richard C. Ruskell, Social Security Disability Claims Handbook § 2:15 n.40 (2017)). As with other medical-opinion evidence, the reliability of a GAF score depends on whether it is "consistent with the other evidence, the rater's familiarity with the claimant, and the credentials of the rater"; GAF scores "should not be considered in isolation." Ruskell, supra, § 2:15 n.40 (citing internal Social Security Administrative Message number 13066, which became effective July 22, 2013, and was revised on Oct. 14, 2014).

have had a diagnosis for "depression" between November 2012 and July 2014 (see AR 528-31 (documents describing Plaintiff as "temporarily unemployable" because of "depression" and "[low back pain]")), and in a March 2015 "Physical Health Assessment for General Relief" from the state, she was noted as taking narcotic pain medication that "prevent[ed] clear thinking," "impair[ed] judgment," and caused "lack of mental acuity" (AR 532-33). On a few occasions when she was seen for low-back pain and her mental status was observed, she was described as "alert," "oriented," "active," and "cooperative" and had a "normal" mood or affect and "good" eye contact. (AR 392 (Dec. 2012), 535 (May 2014).)

In March 2013, Plaintiff received a "complete psychiatric evaluation" from consulting psychiatrist Kapitanski. (AR 372-76.) At the time, no medical records were "available for review" (AR 372), Plaintiff was "not receiving mental health services" (AR 375), and she "ha[d] been off her antidepressants for one year due to financial reasons" (id.). Plaintiff reported having "decreased level[s] of energy, appetite and interests" and "decreased concentration." (AR 372-73). She was also "tearful and distraught" during the interview and presented with symptoms that Dr. Kapitanski found to "meet the criteria for major depressive disorder." (AR 375.) Dr. Kapitanski also found Plaintiff to be "engaged and cooperative during the evaluation." (AR 372.) Plaintiff reported that she would "text friends" and "like[d] spending time with them." (AR 372-73.) She "support[ed] herself" with "General Relief" and "baby sitting." (AR 373. But see AR 48 (Plaintiff testifying nine months later, at Jan. 2014 hearing, that she hadn't babysat "since about 2010

12

maybe"), 58 (Plaintiff testifying at June 2016 hearing that "it was before 2010 that [she] was babysitting").)  And because she was homeless, she "sometimes stay[ed] with her friends."  (AR 374; see also AR 319-28 (one of those friends describing Plaintiff in third-party function report as "pretty self-sufficient").)  She had "adequate self-care skills of dressing, bathing, eating, toileting, and [taking] safety precautions"; she ran errands, shopped, and sometimes cooked; she didn't do household chores; she managed her own money; and her relationship with her mother was "good," while her relationships with her brother and sister were "strained."  (AR 374.)

On examination, she was "alert and oriented to person, place, time, and situation."  (Id.)  She could "register 3 out of 3 items at 0 minutes, 2 out of 3 items at 5 minutes, and 3 out of 3 items with help."  (Id.)  She could do "serial sevens subtraction," spell the word "world" forward and backward, identify similarities between abstract things, analyze the meaning of simple proverbs, name current and past presidents, identify the capital of California, and respond appropriately to "imaginary situations requiring social judgment and knowledge of the norms."  (AR 374-75.)

Dr. Kapitanski assessed Plaintiff with major depressive disorder.  (AR 375.)  She specifically found Plaintiff to have "no difficulty" or limitation with maintaining social functioning, performing work activities on a consistent basis without special or additional supervision, performing simple and repetitive tasks, accepting instructions from supervisors, and interacting with coworkers or the public; "mild" difficulty or

limitation with concentration, persistence, pace, short-term recall, maintaining composure and even temperament, focusing and maintaining attention, and performing detailed and complex tasks; and "moderate" difficulty or limitation "completing a normal workday or work week due to her mental condition" and "be[ing] able to handle the usual stresses, changes and demands of gainful employment." (Id.) Dr. Kapitanski found Plaintiff "intellectually and psychologically capable of performing activities of daily living." (Id.) She also opined that "[h]er prognosis would improve with mental health services." (Id. (stating that "[i]f claimant was to have treatment the above [limitations] would significantly improve"); see also AR 376 (noting again that "claimant's prognosis [was] poor but would improve with mental health treatment or services").)

Plaintiff's medical records were reviewed in April 2013 by state-agency consulting examiner L. O. Mallare. (AR 93-95, 105-07.) Dr. Mallare found Plaintiff "[m]oderately limited" in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 94, 106.) She was otherwise "[n]ot significantly limited" in "understanding and memory" and "sustained concentration and persistence" and was able to "understand and remember simple work related tasks," "perform sustained [simple and repetitive tasks]," and "adapt to minimal changes in a routine workplace." (AR 94-95, 106-07.)

b. *Plaintiff's statements*

In February 2013, Plaintiff completed an adult function report, noting in part that she had "problems with concentration [and] memory." (AR 306.) She reported "exercis[ing] a little," "maybe twice a week" (AR 307); cooking, preparing meals "several days at a time," doing "laundry," and going "grocery shopping" in stores a couple times a week (AR 308-09); going outside to run errands, attend doctor's appointments, pick up mail from her mother's house, and "sometimes visit a friend" (AR 309); paying bills and counting change (id.); and spending time with others and "enjoy[ing] friends" through her phone or Facebook a "few times a week" (AR 310). She indicated that she did not "have any problems getting along with family, friends, neighbors, or others" (AR 311) and that she got along "fine" with authority figures (AR 312).

At her June 2016 hearing, Plaintiff reported that because of her pain she "c[ouldn't] handle stress at all," "c[ouldn't] focus," and "c[ouldn't] . . . concentrate." (AR 61.) She testified that her pain medicine made her "[f]orgetful[]." (AR 60; see also AR 314 (noting in function report that Percocet[5] caused her to not "think straight," made it "hard to focus [and] understand," and brought on "bad memory").) And she stated that she was currently living "with friends" but did not have a place of her own. (AR 62.) Before the hearing ended, she was advised

---

[5] Percocet is an oxycodone-acetaminophen product used to relieve moderate to severe pain. See Percocet, WebMD, https://www.webmd.com/drugs/2/drug-7277/percocet-oral/details (last visited May 4, 2018).

to "pursue" an upcoming psychiatric appointment. (AR 84.) She responded, "I know that, but the thing is, it's my physicality [that's] more my problem." (Id.)

### 3. Analysis

Although Plaintiff takes issue with the ALJ's "rejection" of Dr. Kapitanski's moderate-limitation assessments (J. Stip. at 3-7), it doesn't appear that he rejected those limitations at all. The ALJ gave "significant though partial weight" to Dr. Kapitanski's opinion, rejecting it only if and "to the extent" it suggested that Plaintiff "could not maintain fulltime work." (AR 31.) At step three, the ALJ specifically considered Dr. Kapitanski's findings and determined that Plaintiff was "moderate[ly]" limited in social functioning and maintaining concentration, persistence, and pace. (See AR 26-27.) He attributed the "moderate" limitation in social functioning to evidence that "engaging in unrestricted interaction with others in a work setting might be too stressful" for Plaintiff given her "signs of depression and anxiety/PTSD" (AR 26), mirroring Dr. Kapitanski's finding that Plaintiff had moderate difficulty "completing a normal workday or work week due to her mental condition" (AR 375). And he attributed the "moderate" limitation in concentration, persistence, and pace to Plaintiff's "lowered stress tolerance and perhaps the effects of physical pain or medication use" (AR 27), reflecting Dr. Kapitanski's finding that Plaintiff had moderate difficulty "be[ing] able to handle the usual stresses, changes and demands of gainful employment" (AR 375).

Such findings were supported by substantial evidence. As

16

the ALJ explained, Plaintiff was "clearly capable of being in public independently" and "interacting appropriately with others when necessary" (AR 26 (referencing her appropriate interactions with treating and examining medical sources, her "normal[]" communication at hearing, and her "good" relationships with friends and family)), and she "exhibited no serious cognitive problems during Dr. Kapitanski's examination" or with any treating source (AR 27; see, e.g., AR 374-75 (successful completion of mental-status exam), 379-80 (psychosocial report finding Plaintiff "intelligent," "friendly," "outgoing," "cooperative," and "polite")). Still, the ALJ found, she "experienced anxiety and depression at times," which "could reasonably be expected to interfere with her ability to interact with others in a work setting at least on an infrequent basis" (AR 27) and "might prevent her from performing more complex tasks (which are definitely more stressful)" (AR 31; see, e.g., AR 375 (Dr. Kapitanski assessing Plaintiff with "Major Depressive Disorder" and GAF score of 57), 382 (psychologist assessing Plaintiff with "Pain Disorder Associated With . . . Psychological Factors" and GAF score of 63)).

In formulating the RFC, moreover, the ALJ limited Plaintiff to "occasional interaction with coworkers, supervisors and the general public" and "limited unskilled to semiskilled work (maximum SVP 4)," which he found would not "present serious work stress" or "require excessive stressful changes in routine necessarily." (AR 28, 31.) This RFC determination properly tracked Dr. Kapitanski's stress-related limitations. See Fergerson v. Berryhill, No. 5:17-cv-00161-KES, 2017 WL 5054690,

17

at *3-4 (C.D. Cal. Nov. 1, 2017) (finding that ALJ "reasonably" determined plaintiff's RFC limiting him to "non-public, unskilled or semiskilled work," "mitigat[ing] against the stress likely to aggravate [his] depression and cause absenteeism"); see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (finding that ALJ did not err when he incorporated moderate mental limitations into RFC by restricting plaintiff to "simple, routine, repetitive . . . work, requiring no interaction with the public"); Hughes v. Colvin, 599 F. App'x 765, 766 (9th Cir. 2015) (holding potential error in assessing medical opinion harmless when ALJ's RFC took into account plaintiff's "moderate difficulties in social functioning" by restricting her to "job[s] where she could work independently with no more than occasional public interaction"); Withrow v. Colvin, 672 F. App'x 748, 749 (9th Cir. 2017) ("[C]laimants with moderate mental limitations are capable of doing simple unskilled work.").

Further, the ALJ's RFC determination was supported by the January 23, 2014 hearing hypothetical, in which the testifying VE considered someone with "moderate limitation completing a normal workday or work week due to her mental impairment" and "moderate difficulty to be able to handle the usual stress changes and demands of gainful employment" — the same moderate limitations opined by Dr. Kapitanski — and found that such a person could perform Plaintiff's past work. (AR 52); see Holstine v. Colvin, No. C14-5822 BHS, 2015 WL 4920106, at *7 (W.D. Wash. Aug. 18, 2015) (affirming ALJ when hypothetical to VE included "marked limitations in . . . ability to interact with supervisors and moderate limitations in . . . ability to interact with co-

workers" and VE found jobs still available, rendering potential ALJ error "harmless"). Accordingly, Plaintiff's argument that the ALJ rejected Dr. Kapitanski's moderate limitations does not appear to be supported by the record.

To the extent the ALJ did reject Dr. Kapitanski's moderate assessments, however, he did not err for the reasons discussed below. As Plaintiff apparently concedes (see J. Stip. at 5), the ALJ was required to provide only a "specific and legitimate reason" to do so, see Carmickle, 533 F.3d at 1164. He provided two such reasons: the moderate limitations Dr. Kapitanski assessed were "not necessarily consistent with the evidence," specifically Plaintiff's daily activities and mental-health record, and were "vague." (AR 31.)

a. *Inconsistency with the Evidence*

i. *Daily activities*

The ALJ explained that Plaintiff was still "able to maintain her usual routine without difficulty[] and see to her own needs generally and without assistance." (Id.) This was a specific and legitimate reason for discounting Dr. Kapitanski's "moderate" assessments. See Taylor v. Colvin, 667 F. App'x 256, 256-57 (9th Cir. 2016) (recognizing inconsistency with "daily activities" as "specific and legitimate reason[]" for discounting examining physician's opinion); see also Coaty v. Colvin, 673 F. App'x 787, 787-88 (9th Cir.) (affirming ALJ's adverse determination of treating physician's medical opinion because it was "speculative and inconsistent" with activities of daily living), cert. denied sub nom. Coaty v. Berryhill, 137 S. Ct. 2309 (2017); Lunn v. Astrue, 300 F. App'x 524, 525 (9th Cir. 2008) (affirming ALJ's

rejection of treating physician's opinion that was "contrary to [plaintiff's] reports of her daily activities").

Dr. Kapitanski herself noted many of the activities Plaintiff reported engaging in: she baby-sat, texted and enjoyed spending time with friends, had "adequate self-care skills," ran errands, shopped, cooked, and managed her own money. (AR 372-74.) Her adult function report further indicated that she "exercis[ed] a little," cooked, did laundry, went grocery shopping in stores, ran errands, attended doctor's appointments, paid bills, and visited and spent time with friends through her phone or Facebook. (AR 307-10.) She could go out alone (AR 309) and did not need help, reminders, or encouragement to take care of herself, her chores, or her medication (AR 307-08, 310).

Moreover, at her hearing, Plaintiff testified that her physical health — rather than mental health — was "more [her] problem." (AR 84.) Her friend admitted that Plaintiff was "pretty self-sufficient" (AR 319-28), and Dr. Kapitanski too found that she was "intellectually and psychologically capable of performing activities of daily living" (AR 375).

Together, Plaintiff's demonstrated daily activity and ability to mentally function undermined the "moderate" limitations Dr. Kapitanski assessed as to completing a normal workday or workweek and handling the "usual stresses, changes, and demands" of gainful employment. See McDonald v. Berryhill, No. 1:16-cv-01477-SKO, 2018 WL 1142192, at *11-13 (E.D. Cal. Mar. 2, 2018) (finding that doctor's opinion that plaintiff "was not capable of maintaining regular employment . . . [or] handl[ing] even low stress" work because of mental-health limitations was

properly discounted because it conflicted with fact that he "performed yard work, regularly grocery shopped, attended church, attended his children's school activities when possible, sometimes drove, sometimes walked, sometimes exercised at the gym, used the computer, watched television, and read books"); Belmontez v. Colvin, No. ED CV 14-1590-PLA, 2015 WL 2063945, at *4-5 & n.5 (C.D. Cal. May 4, 2015) (affirming ALJ's finding that plaintiff's "impaired" memory, social skills, concentration, and motivation, among other treating-source assessments, were inconsistent with his daily activities, which included "walking his dog, visiting friends and family, reading, listening to music, maintaining his personal care, preparing his meals, cleaning, doing laundry, riding in a car, going out alone, shopping for clothes and other items, and managing his own finances"). Thus, substantial evidence supports any discounting by the ALJ of Dr. Kapitanski's moderate-limitation assessments based on inconsistency with Plaintiff's daily activities.

ii. *Objective medical evidence*

Inconsistency with the objective medical evidence is a specific and legitimate reason for discounting a physician's opinion. See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). The ALJ here found Dr. Kapitanski's "moderate" limitations inconsistent with the medical evidence to the extent they "suggest[ed] that [Plaintiff] could not maintain fulltime work as described." (AR 31.) Indeed, in the immediately preceding paragraph, the ALJ explained that Plaintiff "displayed no objective signs of cognitive deficits under clinical examination," as in "Dr. Kapitanski's independent examination

21

report" and other treatment records "not[ing] no memory or cognitive deficits, at least when her mental state was observed during the relevant period." (AR 30.) Substantial evidence supports the ALJ's reasoning.

For example, Dr. Kapitanski's psychiatric-examination findings were unremarkable. (See AR 374); Larkins v. Colvin, 674 F. App'x 632, 633 (9th Cir. 2017) (ALJ properly rejected physician's opinion that was "inconsistent . . . with his own findings"); Hernandez v. Berryhill, 707 F. App'x 456, 457-58 (9th Cir. 2017) (inconsistency with "own treatment notes" is specific and legitimate reason for discounting physician's opinion). Plaintiff was "alert and oriented" and "engaged and cooperative" and could successfully complete each of the cognitive tests administered. (AR 372, 374-75 (registering three out of three items, doing "serial sevens subtraction," spelling words backward and forward, identifying similarities between abstract things, analyzing meaning of proverbs, recalling presidents and state capitals, and responding to imaginary social situations).) She had "adequate self-care skills" and the ability to carry out her daily activities independently, and Dr. Kapitanski concluded that she was "capable of performing activities of daily living" without any noted difficulty or limitation. (AR 374-75.) She also opined that Plaintiff's condition would "significantly improve" with mental-health treatment.[6] (AR 375-76.) Despite

---

[6] Plaintiff testified that she did not receive mental-health treatment during the relevant period because she was "having a hard time with everything else in [her] life" and "didn't have any money." (AR 64.) Although lack of insurance is a valid reason for limited treatment, see Smolen, 80 F.3d at 1284, that

such observations, Dr. Kapitanski found that Plaintiff was

"moderate[ly]" limited in her ability to complete a normal

workday or work week and handle the "usual stresses, changes and

demands of gainful employment." (AR 375.) The doctor provided

no explanation for these more severe assessments. See Thomas,

278 F.3d at 957 ("The ALJ need not accept the opinion of any

physician . . . if that opinion is brief, conclusory, and

inadequately supported by clinical findings."); Von Orsdol v.

Colvin, 671 F. App'x 410, 410 (9th Cir. 2016) (physician's

opinion properly discounted when it was "unexplained and

unsupported by evidence").

Plaintiff argues that Dr. Kapitanski's opinion was

consistent with state-agency consultant Mallare's opinion,

specifically the moderate limitations he assessed. (J. Stip. at

5-6.) But the ALJ rejected those limitations (AR 31-32), a

finding Plaintiff has not challenged (see generally J. Stip.).[7]

_____

does not seem to be the case here. As evidenced in the record,
Plaintiff was more than capable of affording treatment for her
physical health during the relevant period (see, e.g., AR 389-
402, 535-40, 543-44), so it is unclear that any purported lack of
funds or insurance prevented her from obtaining psychiatric
treatment. Moreover, she was able to and did seek out such
services previously on her own. (See, e.g., AR 378-85.) Indeed,
at the time of the hearing she had scheduled an appointment with
a psychiatrist. (AR 64, 84.) Thus, her failure to get mental-
health treatment during the relevant period seems to stem from
her physical-health issues predominating over her mental ones, as
she herself stated (AR 84), suggesting that any lack of treatment
was "more a function of the fact that she did not need it," see
Judge v. Astrue, No. CV 09-4743-PJW, 2010 WL 3245813, at *4 (C.D.
Cal. Aug. 16, 2010).

[7] The ALJ also rejected the March 2015 opinion suggesting
that Plaintiff's cognitive ability was impaired by her use of
narcotic pain medication (AR 30; see also AR 532-33), and
Plaintiff has not challenged that assessment either or even

23

Indeed, the ALJ properly discounted Dr. Mallare's opinion for the same reason he discounted Dr. Kapitanski's: it was inconsistent with the medical record, particularly given that Dr. Mallare assessed even more numerous moderate limitations than Dr. Kapitanski and yet Plaintiff "displayed no serious cognitive deficits under examination at any time." (AR 31-32); see Thomas, 278 F.3d at 957.

As explained by the ALJ, although the record contains no treatment notes "regarding [Plaintiff's] mental functioning" during the relevant period, the record does reflect normal cognitive function at times "when her mental state was observed" on physical examination. (See AR 30-31; see also AR 392 (noting that Plaintiff was "oriented to time, place, and person"; had "normal mood and affect"; and was "active and alert"), 535 ("alert, oriented, cognitive function intact, cooperative with eye exam, good eye contact").) Such evidence was consistent with findings predating the relevant period, when Plaintiff last received treatment for depression. (See AR 383-84 (noting that Plaintiff was "talkative" and "oriented x4" and had "normal eye contact" and "appropriate" mood), 379-80 (noting that Plaintiff had "good interpersonal skills" and was "friendly, outgoing, cooperative[,] polite," "intelligent," "proactive about self-care," and "caring toward others").) Such evidence was also consistent with Plaintiff's own testimony that her physical-health symptoms were "more [a] problem" than her alleged mental impairments. (AR 84.) Thus, "given her benign clinical

raised that opinion as affirmative evidence of her alleged mental-health issues.

24

presentation" (AR 30-31), the ALJ properly discounted Dr. Kapitanski's moderate limitations as inconsistent with the medical evidence. See Smith v. Berryhill, No. 6:16-cv-01297-MC, 2018 WL 468281, at *3 (D. Or. Jan. 18, 2018) (finding it "reasonable for the ALJ to interpret the medical record as inconsistent with [doctor's] opinion" given findings throughout record of plaintiff's "normal mental status" and "mild to moderate" impairments); Favale v. Astrue, No. 09-CV-2513 WQH (WMc), 2010 WL 3464820, at *4 (S.D. Cal. July 14, 2010) (affirming rejection of mental-health opinion that was contradicted by "objective medical evidence," including findings that plaintiff was "alert[] and fully oriented with average intelligence and a normal affect," had "fair insight and judgment," and demonstrated "behavior within normal limits"), accepted by 2010 WL 3464793 (S.D. Cal. Aug. 30, 2010).

### c. *Vagueness*

An ALJ may also properly reject limitations that are "too vague to be useful." King v. Comm'r of Soc. Sec. Admin., 475 F. App'x 209, 210 (9th Cir. 2012). Here, the ALJ found vague Dr. Kapitanski's use of the term "moderate." (AR 31 (stating that "'moderate' is a somewhat vague term").) Indeed, the "moderate" limitations she assessed seemed contradicted by Plaintiff's noted daily activities and her "benign" examination findings, as already discussed. And the doctor failed to clearly explain the basis for her moderate-limitation conclusions or what meaning she intended "moderate" to convey.

But Dr. Kapitanski, as a consultative examiner, may have used the term in the sense adopted by the Social Security

Administration, in which "moderate" signifies "more than a slight limitation in [an] area, but the individual can still function satisfactorily." See Fergerson, 2017 WL 5054690, at *3 (citing SSA Form HA-1152-U3); see also Cantu v. Colvin, No. 5:13-CV-01621-RMW, 2015 WL 1062101, at *14 (N.D. Cal. Mar. 10, 2015) (same). Assuming that definition applied, the ALJ still reasonably rejected her use of the term to the extent it suggested Plaintiff "could not maintain fulltime work," as discussed above, and hence conflicted with the SSA definition. (AR 31.)

In any event, as also explained above, the ALJ properly accounted for the unrejected portions of Dr. Kapitanski's "moderate" assessments by formulating an RFC limiting Plaintiff to "unskilled-semiskilled work with limited social contact," which, as he explained, "would not present serious work stress or require excessive stressful changes in routine necessarily." (AR 31); see Fergerson, 2017 WL 5054690, at *4; see also Stubbs-Danielson, 539 F.3d at 1173-74; Hughes, 599 F. App'x at 766; Withrow, 672 F. App'x at 749.

Accordingly, the ALJ did not err in assessing Dr. Kapitanski's opinion, nor did he err as to the RFC or VE hypothetical. Because properly rejected medical evidence need not be incorporated into a claimant's RFC, the ALJ did not "fail" to include moderate limitations in Plaintiff's, as she alleges. See Bayliss, 427 F.3d at 1217. And because the hypothetical presented to the VE included all the limitations supported by the record, it too was proper, and the ALJ was entitled to rely on it. See Thomas, 278 F.3d at 956 (finding VE testimony reliable

when hypothetical posed included all claimant's functional limitations); see also Bayliss, 427 F.3d at 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony."). Substantial evidence supports the ALJ's analysis in this regard. Thus, remand is not warranted. See Saelee, 94 F.3d at 522.

B. The ALJ "Fully and Fairly" Developed the Record

Plaintiff argues that the ALJ failed to meet his duty to "fully and fairly" develop the record. (J. Stip. at 14-15.) Specifically, because of the "limited mental health medical records in this case," she contends, the ALJ should have ordered another consultative psychiatric examination. (Id. at 14.)

1. Applicable law

An ALJ has a "duty to fully and fairly develop the record" and "assure that [a] claimant's interests are considered." Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 2006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). But it nonetheless remains the claimant's burden to produce evidence in support of her disability claim. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (as amended). Moreover, the "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted); accord Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). An

27

ALJ has broad discretion in determining whether to order a consultative examination and may do so when "ambiguity or insufficiency in the evidence . . . must be resolved." Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); § 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim.").

        2.  Analysis

    Plaintiff argues that the ALJ should have ordered an additional psychiatric examination because Dr. Kapitanski's and Dr. Mallare's opinions "were from 2013," three years before her June 2016 hearing.[8]  (J. Stip. at 14.)  That fact fails to show that the record was inadequate to properly evaluate her mental limitations, however.

    The lack of mental-health records during that period was itself evidence of the stable nature of Plaintiff's minor mental impairments.  Indeed, nothing indicates that Plaintiff's mental state changed during the three years following Dr. Kapitanski's examination or Dr. Mallare's review.  Aside from depression, Plaintiff exhibited normal cognitive functioning whenever her

_____

    [8] Plaintiff's argument seems to apply primarily to her SSI application.  For purposes of SSI, the relevant period began on October 11, 2012, the application date, and ended on August 4, 2016, the date of the ALJ's decision.  See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1000-01 & n.1 (9th Cir. 2015) (as amended) (citing § 416.335).  For purposes of DIB, however, the relevant period began on July 13, 2012, the alleged onset date, and ended on December 31, 2014, the date last insured.  (See AR 21); see also Lingenfelter, 504 F.3d at 1033.  Thus, the three-year period applies only to the SSI application.  In any event, Plaintiff's argument fails for the reasons discussed below.

mental status was noted (see, e.g., AR 392 (Dec. 2012), 535 (May 2014)), mirroring the normal mental-health findings from before the relevant period (see, e.g., AR 383-84, 379-80, 403, 419, 435). Even the rejected March 2015 opinion that Plaintiff's narcotic pain medication may have impaired her "mental acuity" (AR 30, 532-33) did not suggest that her mental health had deteriorated since March 2010, when she was noted as using Percocet — a narcotic pain medication — and found to be "intelligent" and "proactive about self-care" (AR 380, 382). Indeed, throughout the relevant period, records of Plaintiff's normal mental state were coupled with notes of her concurrently taking narcotic pain medication. (See AR 391-92 (Dec. 2012: while on Percocet, Plaintiff had "normal mood and affect" and was "active and alert" and "oriented to time, place, and person"), 372-76 (Mar. 2013: Dr. Kapitanski noting Percocet as one of Plaintiff's "current medications" and observing her successfully complete mental-status exam), 535 (May 2014: while on oxycodone, the narcotic component of Percocet, Plaintiff was "alert," "oriented," and "cooperative," with "cognitive function intact"); see also AR 419 (Aug. 2011: while on Percocet, Plaintiff was "awake, alert, and oriented x3" and "her neurological examination . . . [was] within normal limits").)

Moreover, as discussed above, any adverse assessment by the ALJ of Dr. Kapitanski's opinion was proper and adequately supported by substantial evidence, none of which suggested more severe mental limitations. Thus, the record was not ambiguous or inadequate, and the ALJ had no duty to develop it further. See Meltzer v. Colvin, No. CV 13-6164 AGR, 2014 WL 2197781, at *4

29

(C.D. Cal. May 27, 2014) (finding that ALJ did not violate duty to develop record in not ordering psychiatric consultative examination because record was neither ambiguous nor inadequate and showed that claimant's schizophrenia was stable and well controlled by medication).

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[9] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: May 4, 2018                          _____
                                            JEAN ROSENBLUTH
                                            U.S. Magistrate Judge

_____

[9] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."